**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **C.C,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **1:24-cv-7811** |
| | ) | |
| **GOOGLE, LLC.,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendant.* | ) | |

---

### AMENDED COMPLAINT

---

Plaintiff C.C. ("Plaintiff" or "C.C.") brings this Amended Complaint against Defendant Google, LLC. ("Defendant" or "Google" or the "Company") to redress violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

### NATURE OF CLAIMS

1. Google hired C.C. in 2018 to serve in its Agency Partnership Business Unit. During his tenure with the Agency Partnership Business Unit, C.C. excelled in his performance. As a result of his positive performance, in May 2022, Google promoted C.C. from L4 to L5 and in August 2022, Google recruited C.C. for the role of Senior Product Lead—which accompanied a higher title and additional responsibility. Unfortunately, C.C. suffers from post-traumatic stress disorder ("PTSD") and anxiety—both disabilities under the ADA, NYSHRL, and NYCHRL— stemming from a brutal attack in 2014. C.C. was also diagnosed with Stage 3 Hodgkin's Lymphoma in 2016. C.C. continues

1

to receive medical treatment for his disabilities. Despite C.C.'s outstanding performance, Google refused to accommodate C.C. and terminated C.C.'s employment after C.C. took protected leave and requested reasonable accommodations for his disabilities.

**PARTIES**

2.      Plaintiff, C.C., is an individual and resident of Fort Lee, New Jersey.  Google employed C.C. from August 2018 through June 27, 2024, and at all times relevant to this Amend Complaint.  Throughout his employment with Google, C.C. primarily performed work for Google in New York City, in the Southern District of New York.

3.      Defendant, Google, is a limited liability company formed under the laws of the State of Delaware with a principal place of business at 1600 Amphitheater Parkway, Mountain View, CA  94043.  Google employs workers across the globe, including within the Southern District of New York.

**JURISDICTION AND VENUE**

4.      This Court has original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331 because this claim arises under federal statutes, including the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").

5.      This Court also has supplemental jurisdiction of the claims that arise under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* pursuant to 28 U.S.C. § 1367 because these claims arise out of the same events or omissions and form part of the same case or controversy as the federal claims that are properly before this Court.

6.      Venue is proper in this judicial District under 28 U.S.C. §§ 1391(b), (c) because Defendant conducts business in this District and a substantial part of the events or omissions giving rise to these claims alleged herein occurred in this District.

## ADMINISTRATIVE REMEDIES

7.      Within 300 days of the discriminatory conduct of which he complains, Plaintiff filed a charge of discrimination on the basis of disability with the United States Equal Employment Opportunity Commission ("EEOC") on August 5, 2024 pursuant to the ADA, NYSHRL, and NYCHRL.

8.      On October 23, 2024, the EEOC issued Plaintiff a Notice of Right to Sue ("NRTS"). Within 90 days of receipt of the NRTS, Plaintiff amends this Complaint to certify that he has satisfied all administrative perquisites under the ADA.

9.      Neither the NYSHRL nor the NYCHRL requires administrative exhaustion prior to filing a Complaint. *See Branker v. Pfizer, Inc.*, 981 F. Supp. 862, 865 (S.D.N.Y. 1997) (plaintiff's "claim under the NYSHRL is not administratively barred, because that statute contains no requirement of exhaustion of administrative remedies"); *Hernandez v. New York City Law Dep't Corp. Counsel*, 1997 U.S. Dist. LEXIS 620, at *29 (S.D.N.Y. Jan. 23, 1997) ("Unlike Title VII, the NYSHRL and NYCHRL do not require exhaustion of administrative remedies").

10.     The FMLA does not require an exhaustion of administrative remedies. *See Manos v. Geissler*, 377 F. Supp. 2d 422, 427 (S.D.N.Y. 2005) ("FMLA does not require an exhaustion of administrative remedies prior to initiation of a lawsuit under its provisions").

**FACTUAL ALLEGATIONS**

11.     Google hired C.C. in August 2018 to join its Agency Partnership Team. Due to C.C.'s outstanding experience and performance, in May 2022, Google promoted C.C. from an L4 to an L5 and in August 2022, Google named C.C. the Senior Product Lead for the Agency Business Unit.

12.     Senior Product Leads interact with upper levels of management and have increased visibility and responsibility throughout the department.

13.     Because of his exceptional abilities, Google relied upon C.C. to be the only Privacy Product Lead for the Agency Business Unit, whereas most other business units at Google have 3 to 4 Privacy Product Leads.

14.     Supervisors and directors at Google recognized C.C. for his team's superior metrics, his wealth of knowledge and experience, and his outstanding relationships with agencies and stakeholders, frequently noting in his performance evaluations that his outstanding performance had a "significant impact" within the Company.  In recognition of his talents, Google provided C.C. with numerous performance awards and relied upon him as an expert speaker when collaborating with regional and global marketing teams and in leading Google's national and global summits and training academies.

**C.C. Requested Reasonable Accommodations for His PTSD and Anxiety.**

15.     Unfortunately, in 2014, C.C. was brutally attacked in New York City, causing him to suffer post-traumatic stress disorder ("PTSD") and severe anxiety.

16.      PTSD and anxiety are both medical conditions that affect the major bodily functions of brain and nervous system operation and functioning.  The effects on the functions of the brain and nervous system caused by  PTSD and anxiety substantially limit C.C.'s ability to

perform major life activities like sleeping, concentrating, working, and social interaction. Anxiety and PTSD cause sufferers to experience fear, worry, distress, mental anguish, flashbacks, and nightmares. Navigating daily tasks, including work, while also navigating these symptoms causes individuals with these conditions—including C.C.—to be distracted, have trouble concentrating, and experience heightened stress during social interaction.

17. Additionally, C.C. was diagnosed with Stage 3 Hodgkin's Lymphoma in March 2016, for which he underwent chemotherapy. Hodgkin's Lymphoma includes cancer in the lymph nodes surrounding the diaphragm and can rapidly spread throughout the body.

18. The cancer diagnosis and treatment aggravated Mr. Coco's PTSD and severe anxiety. Specifically, receiving a cancer diagnosis and undergoing chemotherapy are extremely stressful events and these exacerbated C.C.'s underlying anxiety and PTSD symptoms, including worry, fear, and stress.

19. Throughout his employment, C.C. openly communicated with Google about his PTSD, anxiety, and cancer diagnosis. C.C. also often used his experiences with PTSD and anxiety to motivate and inspire his team at Google by discussing with colleagues how he coped with his disabilities while still delivering an exceptional work product.

20. From December 4, 2023 through March 1, 2024, C.C. took FMLA leave due to his disability and accompanying symptoms.

21. During the leave, C.C.'s medical providers identified his commute into New York City for work—where he was previously attacked—as a trigger for the onset of his PTSD and anxiety symptoms and concluded that this trigger was worsening C.C.'s PTSD and anxiety.

22. Commuting to New York City for work, including taking public transportation in New York City and walking the sidewalks in New York City (where C.C. was previously attacked), triggered his anxiety and PTSD symptoms by causing C.C. extreme fear and concern

for his well-being. By being back in the environment where C.C. was previously attacked, C.C. was forced to be vigilant and constantly on-guard against another attack. This caused C.C. to be distracted and anxious thereby impacting his ability to work, focus, and concentrate at work.

23. Further, this anxiety and PTSD caused C.C. trouble sleeping, trouble with cognitive function, feelings of overwhelm and stress, and social anxiety when interacting with others.

24. C.C.'s anxiety and PTSD symptoms would last for hours or days and C.C. saw mental health care providers to cope with these symptoms.

25. C.C.'s medical providers recommended reasonable accommodations of fully remote work and breaks throughout the day for a period of two years. With these accommodations, C.C. was able to perform the essential functions of his job.

26. On March 1, 2024, C.C. returned from his FMLA leave and requested (1) majority remote work (remote work except for occasionally required in-person meetings or travel), (2) a 1-hour lunch break each day, and/or (3) 15-30 minute breaks between meetings as reasonable workplace accommodations.

27. C.C.'s request for majority remote work, a 1-hour lunch break and/or 15-30 minute breaks were reasonable accommodations.

28. In fact, at the time of C.C.'s request for reasonable accommodations, Google had a soft policy of allowing remote work 2 days per week, but even that was not strictly enforced. In actuality, Google allowed C.C., many other Google employees on his team, and other employees throughout the country to work remotely 3-4 days per week.

29. Prior to his request, on the days that C.C. was in the office, he spent most of his time on his computer and seldomly attended meetings where in-person interactions were required.

30. Many of C.C.'s team members worked across the country, and in-person team meetings rarely occurred, especially because C.C.'s direct supervisor, Flora Ching ("Ms. Ching")

worked 100% remotely from Oklahoma, although her "home office" was in California.

31.    Additionally, Google had been encouraging employees to meet virtually and to travel less in an effort to minimize travel costs for the Company.

32.    Adding to the reasonableness of his request, C.C.'s remote work accommodation request included a carve-out for occasional, required in-person meetings and business-related travel. C.C. even requested to keep his mandatory in-person meeting and travel frequencies at the same rate as they had been prior to his request: about once per quarter. Prior to requesting a reasonable accommodation, Google required that C.C. attend an in-person meeting or travel for work approximately once per quarter. C.C. did not request any modification to Google's in-person meeting/travel requirement and instead simply requested that outside of these occasional requirements, he be permitted to work from home.

33.    C.C.'s reasonable accommodation request for full time remote work with occasional commutes to the office and locations across the US for mandatory meetings and business-related travel was not only reasonable, but it was also in line with Google's policies and practices at the time.

34.    Additionally, C.C. requested 15-30 minute breaks between meetings and/or a 1-hour guaranteed lunch break so that he could catch up on emails, document meeting notes, and perform other non-meeting work. Given C.C.'s disabilities, this would enable him to manage his thoughts and the symptoms of his disabilities while also preparing for the next meeting, rather than jumping from back-to-back meetings. The meetings breaks were to be used for non-meeting work, like checking emails or documenting notes, and therefore would not shorten his work hours or otherwise interfere with the essential functions of his job.

**Google Denied C.C.'s Reasonable Accommodation Requests.**

35.     Google denied C.C.'s reasonable accommodation requests. In denying C.C.'s request for reasonable accommodations, Google claimed that C.C. was unable to perform the essential functions of his job with or without accommodations.

36.     Prior to his disability leave, C.C. had been performing the essential functions of his job not only satisfactorily, but exceptionally, as evidenced by his performance reviews, awards, and other commendations. Specifically, Google routinely assessed C.C.'s performance as "Significant Impact," C.C. frequently performed L6 work although he was an L5, and Google presented C.C. with various awards and accolades in recognition of his outstanding work performance.

37.     Prior to his accommodation request, C.C. worked remotely 2-4 days per week and attended most meetings virtually. C.C. only traveled for mandatory in-person meetings or for business-related meetings approximately once per quarter. C.C. requested to maintain the once-per-quarter travel requirement and work remotely the remainder of the time. There was no function of C.C.'s job which he could not perform with his requested accommodations.

38.     Additionally, C.C. could still perform every part of his job with 15-30 minute breaks between meetings and/or a 1-hour lunch break. Simply scheduling a meeting 15-30 minutes later so that C.C. could manage the symptoms of his PTSD and anxiety would not prohibit the meeting from occurring or reduce the amount of work that C.C. was performing. A 15-30 minute break between meetings would also not create an undue burden on Google, as meetings at Google are frequently pushed back, rescheduled or even cancelled.

39.     As noted below, C.C. later rescinded this accommodation request after Google maintained that it could not accommodate such a request, demonstrating that C.C. continually sought to remain flexible and engage in the interactive process in good faith.

8

40.      Finally, C.C.'s request for a 1-hour lunch break was reasonable. Current team members of the teams where C.C. sought to be transferred confirmed that they took 1-hour lunch breaks and they had similar breaks documented on their calendars. C.C. could have performed all of his work while taking a 1-hour lunch break and his accommodation request was reasonable and aligned with the practices of other employees at Google.

41.      Further, New York mandates that employers provide employees with a 30-minute meal break during a 6+ hour shift. C.C. requested a mere additional 30 minutes beyond the statutory mandate. C.C.'s request was reasonable and not an undue burden on Google.

**Google Created Pretextual Reasons to Justify Denying C.C. Employment For Every Open Role For Which C.C. was Qualified and Applied.**

42.      After denying C.C.'s request for reasonable accommodations, Google entered C.C. into a "Priority Reassignment" process, whereby C.C. was required to identify roles within the Company for which he was eligible and to meet with the hiring managers for these open roles to discuss his needed accommodations. The "Priority Reassignment" process is a Google mechanism by which an employee seeking workplace accommodations can identify and apply for open roles for which they are qualified and where they can be accommodated.

43.      On March 29, 2024, Google placed C.C. on unpaid leave. C.C. took FMLA leave beginning March 29, 2024 while he participated in the Priority Reassignment process.

44.      During the Reassignment Process, C.C. identified more than 25 open roles for which he was qualified and where he could be reassigned with his accommodation requests.

45.      These roles were similar positions to the role which C.C. held prior to his FMLA leave and C.C. was qualified for each one.

46.      For each role that C.C. identified, two members of Google's Accommodation Mobility team, along with the role's recruiter, would review the job posting and C.C.'s resume to

9

confirm that he met the minimum qualifications for each role before contacting the hiring manager for the role to arrange an interview with C.C.. Therefore, for every role where C.C. met with the hiring manager, Google had previously reviewed and confirmed that C.C. met the minimum qualifications for the role before ever scheduling an interview with C.C. and the role's hiring manager.

47.     However, with each role, Google searched for and created reasons why C.C. was not qualified for the open role, or why his disabilities could not be accommodated within those roles. Google also changed the position descriptions for open roles after meeting with C.C. to thereby disqualify him from transferring to open roles.

48.     For example, C.C. identified the Global Product Lead role as a role for which he was qualified. The individual who previously held the title, Tess Cameran, performed the role fully remotely. C.C. received feedback from the hiring manager, Claire Fanning ("Ms. Fanning"), who agreed that C.C. was qualified for the position. However, Ms. Fanning told the Accommodations team that his request for a 1-hour lunch break everyday might disqualify him from the role because "most of the team does not take lunch."

49.     C.C. spoke with many of the team members on Ms. Fanning's team and they all confirmed they took lunch breaks every day. For example, Tina Sharma and Emmanual Rabkin confirmed that they were able to take a 1-hour lunch break each day. Further, most of the team members had 1-hour lunch break blocks on their shared calendars every day.

50.     Google then took 60 days to perform an undue hardship analysis. On June 20, 2024, Google communicated that C.C.'s transfer to the Global Product Lead role would not be an undue hardship. However, instead of transferring C.C. into this position for which he qualified and where he could be accommodated, Google eliminated the open position.

51.     The Global Product Lead role was a key position on one of the most high-demand

10

and top-performing teams in all of Google; it was illogical and inconsistent that Google would hold the role open for several months and only "eliminate" the role after C.C.'s undue hardship analysis was completed.

52.     C.C. met the minimum qualifications for several other roles, but once each hiring manager learned of C.C.'s reasonable ADA accommodation request, the manager would change or increase the minimum requirements so that C.C. no longer fell within the qualified range.

53.     Specifically, this occurred with the Google Cloud Service ("GCS") Manager Enablement Lead role. C.C. met the minimum qualifications described in the position description. However, after meeting with the hiring manager,  the hiring manager changed the minimum position requirements to add an additional requirement that the candidate have specialized sales experience.

54.     Although C.C. had significant sales experience, Google still refused to transfer him to this open role. C.C. discussed the increased job requirements with the recruiter for the role, Jill Miller, who stated that she was not clear why C.C.'s 7 years of experience in sales enablement and direct sales did not fulfill the qualifications of the role as posted.

55.     Another example was the Strategic Employer Engagement Lead role. C.C. met the minimum qualifications.  However, the hiring manager, Rob Magliaro, after learning of the reasonable accommodation request, claimed that, despite the fact that it was not listed in the job description, the position required a lot of travel; and C.C. could not be accommodated in this role. Again, this was an example of a hiring manager adding or changing the position requirements after learning of C.C.'s accommodation requests.

56.     A third example was the Sales Enablement Consultant role.  Although C.C. met the minimum qualifications, the hiring manager, Mr. Anjai, told C.C. that he had "preferences" that were not listed in the job posting for someone with more "enterprise experience" in sales than C.C..

57.     A fourth example was the role of Apigee Sales Specialist, GCS.  After C.C. listed

11

this position as one of interest, the hiring manager, Dan Mearls, removed the posting and the position became suddenly unavailable.

58.    A fifth example was the position of Apple Partnerships Manager, YouTube, for which C.C. qualified. Christine Kim, the hiring manager, told the Mobility team that Google was unable to accommodate 15–30-minute breaks between meetings. C.C. later withdrew his request for 15-30 minute breaks between meetings after facing push back from hiring managers, but was still not selected for the role.

59.    A sixth example was the position of Innovation Consultant, GCS. The hiring manager,  Stefan Schaeuble, told the Accommodations team that Google was unable to accommodate his reasonable accommodation request because the role required travel that was not listed in the job description.

## Google Terminated C.C.'s Employment After Denying Him a Reasonable Accommodation and 4 Months Following His Protected Activity.

60.    Four months after C.C.'s request for a reasonable ADA accommodations and after weeks of identifying and interviewing for alternative roles into which Google had no intention of placing C.C., Google terminated C.C.'s employment on June 27, 2024.

61.    Google's stated reason for the termination of Mr. Coco's employment was that Google could not accommodate C.C. in his current position and could not identify any other positions for which C.C., who had been an outstanding and productive Google employee for 6 years, could be accommodated.

62.    Google's decision to terminate C.C.'s employment came just 4 months after C.C. returned from FMLA leave and requested reasonable workplace accommodations.

**CAUSES OF ACTION**

**COUNT ONE**
**ADA, NYSHRL, NYCHRL**
**Disability Discrimination**

63.     C.C. incorporates by reference paragraphs 11 to 62 as alleged above.

64.     The ADA, the NYSHRL, and the NYCHRL prohibit employers from discriminating against employees because of their disabilities.

65.     Under the ADA, a disability is an impairment which substantially limits one or more major life activities. 42 U.S.C. § 12102(1).

66.     Major life activities are "activities that are of central importance to daily life." *Lam v. New York City Dep't of Educ.*, 2019 WL 2327655, at *6 (S.D.N.Y. May 30, 2019). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

67.     A plaintiff's burden to show they are "disabled" within the meaning of the ADA is "minimal." *Lam v. New York City Dep't of Educ.*, 2019 WL 2327655, at *6 (S.D.N.Y. May 30, 2019) (plaintiff alleged she was disabled within the meaning of the ADA because her anxiety, PTSD, and spine condition interrupted her sleep, walking, and lifting).

68.     In 2008, Congress amended the ADA to lower the threshold employees must hurdle to establish that they are "disabled" within the meaning of the Act.  ADA Amendments Act of 2008, Pub. L. No. 110-325, § (2)(b)(5), 122 State. 3553 ("the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis").

69.     Additionally, C.C. can show that he was "disabled" within the meaning of the

ADA by showing that he had a record of disability. *Monroe v. Cnty. of Orange*, 2016 WL 5394745, at *7 (S.D.N.Y. Sept. 27, 2016) (citing *Doers v. Lincare, Inc.*, No. 14-CV-3168, 2016 WL 853102, at *5 (M.D. Fla. Mar. 4, 2016) (finding "ample evidence that could allow a jury to find that [the plaintiff] [was] disabled under the ADA," where she "suffered from anxiety and panic disorder for approximately thirty years," "receive[d] medical treatment for her anxiety disorder," which at times "impact[ed] her ability to sleep, concentrate, and socialize," and gave rise to a doctor's note requesting certain relief)).

70.    The NYSHRL and NYCHRL define disability more broadly than the ADA. Neither statute requires showing that the disability substantially limits a major life activity. *Reilly v. Revlon Inc.,* 620 F.Supp.2d 524, 541 (S.D.N.Y.2009) (*citing Giordano v. City of New York,* 274 F.3d 740, 753 (2d Cir.2001)).

71.    Under the NYSHRL and NYCHRL, an individual is "disabled" if they have "any physical, medical, mental or psychological impairment, or a history or record of such impairment." *Cruz v. Schriro*, 51 Misc. 3d 1203(A), 36 N.Y.S.3d 407 (N.Y. Sup. Ct. 2016); Administrative Code § 8–102(16). A "physical, medical, mental or psychological impairment" means "an impairment of any system of the body; including, but not limited to: the neurological system; the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system." *Id.*

72.    C.C. has, or has a record of, PTSD, anxiety, and cancer—all medical conditions that affect major bodily functions and substantially limit major life activities.

73.    C.C.'s anxiety and PTSD impair his mental and psychological state and impact brain and neurological function.

74.    C.C.'s anxiety and PTSD substantially limit his ability to think, concentrate, focus,

14

work, sleep, and interact with others.

75.    C.C. was treated by medical providers for his anxiety, PTSD, and cancer and his medical records will document his disabilities.

76.    These underlying conditions were significantly exacerbated by C.C.'s cancer and triggered by routine commuting to New York City, where C.C. was the victim of a brutal attack.

77.    Therefore, C.C. is disabled within the meaning of the ADA, the NYSHRL, and the NYCHRL.

78.    C.C. was qualified to perform the essential functions of his position at Google. C.C. had more than 10 years of experience in sales, products, account strategy, and account management prior to being hired by Google. C.C. performed successfully in his position at Google and won numerous awards, accolades, and a promotion from Google. Google praised C.C.'s performance as outstanding in every performance rating.

79.    Google permitted C.C. to work remotely 40% - 80% of the time, commuting to the office for onsite work occasionally and traveling for business once quarterly.

80.    Everyday, onsite work was not an essential part of C.C.'s job.

81.    Frequent travel (more than once per quarter) was not an essential part of C.C.'s job.

82.    C.C. was able to perform the essential functions of his job prior to his request for reasonable accommodations and with his requested accommodations.

83.    However, rather than accommodate C.C. in his current role or transfer C.C. to an open role for which he was qualified, Google terminated C.C.'s employment on June 27, 2024.

84.    Google terminated C.C.'s employment because of his disabilities.

85.    Over 30 years ago in *Alexander v. Choate*, the United States Supreme Court recognized that disability discrimination is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." 469 U.S. 287, 295 1985. Thus, a

15

disabled plaintiff "need not show defendants acted with animosity or ill will" to prove a violation of either the ADA. *I.M. by L.M. v. City of New York*, 111 N.Y.S.3d 273, 283 (2019).

86. Google's actions violate the ADA, the NYSHRL, and the NYCHRL.

87. Google acted in a willful and wanton manner and in callous disregard for C.C.'s statutorily protected rights.

88. As a direct and proximate cause of Google's discriminatory conduct, C.C. has suffered and continues to suffer considerable injury, including but not limited to loss of past and future income, benefits and other privileges and entitlements of employment, mental anguish, severe emotional distress, medical costs, and other compensable damages unless and until this Court grants relief. C.C. is also entitled to attorneys' fees and costs, and other damages as recoverable by law.

**COUNT TWO**
**ADA, NYSHRL, NYCHRL**
**Failure to Accommodate**

79. C.C. incorporates by reference paragraphs 11 to 62 as alleged above.

80. C.C. has, or has a record of, PTSD, anxiety, and cancer—all medical conditions that affect major bodily functions and substantially limit major life activities.

81. Therefore, C.C. is disabled within the meaning of the ADA, the NYSHRL, and the NYCHRL.

82. C.C. was qualified to perform the essential functions of his position at Google. C.C. performed successfully in his position at Google and won numerous awards, accolades, and a promotion from Google. Google praised C.C.'s performance as outstanding in every performance rating.

83. Google permitted C.C. to work remotely most of the time prior to his reasonable accommodation request. Onsite work was not an essential part of C.C.'s job position.

84. C.C. traveled for business less than once quarterly. Frequent travel (more than once

16

per quarter) was not an essential part of C.C.'s job position.

85. The essential functions of C.C.'s job as Senior Product Lead for the Agency Business Unit included activities that he could perform remotely, from anywhere in the United States. C.C. was able to perform the essential functions of his job with the reasonable accommodation of working remotely 5 days per week, commuting occasionally for in-person meetings, and once quarterly business travel.

86. Google permitted other employees on C.C.'s team who were not disabled to work remotely.

87. Google permitted C.C.'s supervisor, Ms. Ching, to work remotely 100% of the time from Oklahoma, when her job base was in California.

88. Google refused to provide C.C. with the reasonable accommodation request of working remotely 5 days per week with occasional commutes and business travel in his current position and terminated him from that position, despite the fact that he had been working under similar conditions prior to formally requesting the accommodation.

89. Google also refused to provide C.C. with a 1-hour lunch break and/or 15-30 minute breaks between meetings. There was no logical reason why Google could not have afforded C.C. these reasonable breaks.

90. Team members in roles similar to those which C.C. sought took 1-hour daily lunch breaks.

91. Further, C.C. requested 15-30 minute breaks between meetings and/or a 1-hour lunch break to manage the symptoms of his PTSD and anxiety (being overwhelmed, distracted, anxious), to gather his thoughts, take notes, and catch up on emails. In short, these breaks were for performing additional non-meeting work and would not have caused an undue burden on Google.

92. C.C.'s requested accommodations did not cause an undue hardship on Google.

17

93.    C.C. was qualified for other open positions at Google which also aligned with his reasonable accommodation requests.

94.    Google's recruiters and Accommodation Managers confirmed that C.C. met the minimum qualifications for open roles before scheduling interviews with the hiring managers for those roles.

95.    When C.C. found open positions within the Company for which he qualified, instead of transferring C.C. to the position and for which the accommodations could be provided, Google created pretextual reasons to disqualify C.C. from the open roles.

96.    Google recognized there were open roles for which C.C. was qualified and where accommodating C.C. would not cause an undue hardship on the Company; however, rather than transfer C.C. to those open roles, Google closed the open role and terminated C.C.'s employment.

97.    Google refused to provide C.C. with a reasonable accommodation and instead terminated C.C.'s employment on June 27, 2024.

98.    Google's failure to provide reasonable accommodations to C.C. was in violation of the ADA, the NYSHRL, and the NYCHRL.

99.    Google acted in a willful and wanton manner and in callous disregard for C.C.'s statutorily protected rights.

100.    As a direct and proximate cause of Google's discriminatory conduct, C.C. has suffered and continues to suffer considerable injury, including but not limited to loss of past and future income, benefits and other privileges and entitlements of employment, mental anguish, severe emotional distress, medical costs, and other compensable damages unless and until this Court grants relief. C.C. is also entitled to attorneys' fees and costs, and other damages as recoverable by law.

18

## COUNT THREE
### ADA, NYSHRL, NYCHRL
**Retaliation**

101.    C.C. incorporates by reference paragraphs 11 to 62 as alleged above.

102.    The ADA, the NYSHRL, and the NYCHRL prohibit retaliation against employees who engage in protected activity under the statutes.

103.    C.C. took protected disability-related leave from November 29, 2023 through March 1, 2024.

104.    C.C. engaged in protected activity by requesting reasonable accommodations for his disabilities on March 1, 2024.

105.    Google placed C.C. on unpaid leave on March 29, 2024, less than 30 days after C.C.'s protected activities.

106.    Less than 4 months after C.C. returned from disability-related leave and requested reasonable accommodations, Google terminated C.C.'s employment on June 27, 2024.

107.    The Second Circuit has held that a gaps of four months between protected activity and an adverse action is adequate to establish a causal connection based on temporal proximity. *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir.2013); *Hubbard v. Total Commc'ns, Inc.,* 347 Fed.Appx. 679, 681 (2d Cir.2009); *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009).

108.    The temporal proximity between C.C.'s protected activity and Google's decision to terminate his employment  gives rise to an inference of retaliation by Google for engaging in protected activity.

109.    Google's retaliatory conduct is a violation of the ADA, the NYSHRL, and the NYCHRL.

110.    Google acted in a willful and wanton manner and in callous disregard for C.C.'s statutorily protected rights.

19

111.    As a direct and proximate cause of Google's discriminatory conduct, C.C. has suffered and continues to suffer considerable injury, including but not limited to loss of past and future income, benefits and other privileges and entitlements of employment, mental anguish, severe emotional distress, medical costs, and other compensable damages unless and until this Court grants relief.  C.C. is also entitled to attorneys' fees and costs, and other damages as recoverable by law.

**COUNT FOUR**
**The FMLA**
**FMLA Retaliation**

112.    C.C. incorporates by reference paragraphs 11 to 62 as alleged above.

113.    The FMLA prohibits adverse employment actions against employees who engage in protected activity under the FMLA.

114.    Google is an employer who employed fifty (50) or more employees for each working day for at least twenty (20) work weeks in the year prior to C.C.'s leave.

115.    C.C. is an FMLA-eligible employee because he was employed by Google for more than 5 years prior to requesting FMLA leave and had been employed by Google for over 1,250 hours in the 12-month period prior to his request.

116.    C.C. took FMLA leave from November 29, 2023 to March 1, 2024.

117.    C.C. took FMLA leave again beginning March 29, 2024. While C.C. was on FMLA leave, Google terminated his employment.

118.    Google terminated C.C.'s employment less than 4 months after he returned from his original FMLA leave and less than 3 months after C.C. resumed FMLA leave.

119.    The temporal proximity between C.C.'s FMLA leaves and Google's decision to terminate his  employment gives rise to an inference of retaliation.

120.    Further, after C.C. returned from FMLA leave on March 1, 2024, Google spent the

20

next 4 months creating pretextual reasons why C.C. could not be granted reasonable accommodations and denying C.C. transfers to other open roles for which he was qualified.

121.   C.C. can show, in addition to the close temporal proximity between his return from leave and Google's decision to terminate his employment, evidence of discrimination and other adverse treatment (such as failure to accommodate) which persisted throughout the 4 months after he returned from FMLA leave.

122.   Google's retaliation against C.C. was in violation of the FMLA.

123.   Google acted in a willful and wanton manner and in callous disregard for C.C.'s federally protected rights.

124.   As a direct and proximate cause of Google's retaliatory conduct, C.C. has suffered and continues to suffer considerable injury, including but not limited to loss of past and future income, benefits and other privileges and entitlements of employment, mental anguish, severe emotional distress, medical costs, and other compensable damages unless and until this Court grants relief. C.C. is also entitled to attorneys' fees and costs, and other damages as recoverable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)   declaring that the acts and practices complained of herein are violations of the ADA, FMLA, NYSHRL, and NYCHRL;

(b)   enjoining and permanently restraining these violations;

(c)   directing Defendant to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated;

(d)   directing Defendant to place Plaintiff in the position he would have occupied but for Defendant's discriminatory treatment, and to make him whole for all earnings he would have received but for Defendant's discriminatory treatment, including but

not limited to lost wages, back pay, front pay, interest, and other lost benefits;

(e)    directing Defendant to pay Plaintiff compensatory damages for his mental anguish and severe emotional distress;

(f)    directing Defendant to pay Plaintiff punitive/liquidated damages;

(g)    directing Defendant to pay Plaintiff nominal damages;

(h)    awarding Plaintiff pre- and post-judgment interest;

(i)    awarding Plaintiff the costs of this action together with reasonable attorneys' fees;

(j)    and granting such other and further relief as this Court deems necessary and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

*/s/ Melissa Washington*
Melissa Washington
mw@washingtonfirmpllc.com
WASHINGTON LAW FIRM, PLLC
260 Madison Avenue, 8th Floor
New York, NY 10016
(646) 823-1655

22